## BRUSH ELECTRIC LIGHT & POWER CO. *v.* WELLS.

Where employees are in the service and subject to the general control and direction of a common master and the labor of each conduces to the accomplishment of the same general purpose for which they are

employed, they are fellow-servants within the meaning of the rule stated in section 2610 of the Civil Code, that, "except in case of railroad companies, the master is not liable to one servant for injuries. arising from the negligence or misconduct of other servants about the same business," although they may be employed in different departments of duty, and so far removed from each other as that one can in no degree control or influence the conduct of the other.

Argued February 10,—Decided March 3, 1900.

Action for damages.　Before Judge Norwood.　City court of Savannah.　February 24, 1899.

*A. C. Wright* and *J. R. Saussy,* for plaintiff in error.
*Twiggs & Oliver,* contra.

FISH, J.　Rebecca Wells sued the Brush Electric Light and Power Company, a corporation doing business in the city of Savannah, for damages for the homicide of her husband, Marlow Wells.　The material parts of her petition were, in substance, as follows:　Her husband was a lineman in the employ of the defendant company, and, in pursuance of his duty, had climbed one of its poles for the purpose of repairing or changing the wires of the company strung thereon.　In order to do the work it became necessary to cut two of the wires.　"He had succeeded in cutting one of the said wires, severing it just above the insulator, leaving a small piece or point projecting therefrom.　In passing his right arm around the pole to cut the other wire at the same point, he rested his right arm, between the elbow and armpit, on this projecting wire, and in some manner his arm, shoulder, or other hand came in contact with the hanging wire which he had just severed. 'When, therefore, he seized the second wire with his nippers to cut it, he received through his body the powerful voltage from said company's wire, which caused his death."　He had been sent by the company to do this particular work, and it knew, at the time a current of electricity was turned on, that he was at work on the wires, or might have known it by the exercise of proper care and diligence.　He had no reason to believe that the current of electricity would be turned on at that time. 'It was turned on suddenly and without his knowledge, just as he was engaged in cutting the wires.　Her husband was free from fault, etc.

The evidence upon the trial showed that Marlow Wells, who

was an experienced lineman, was killed by an electric shock which he received from the wires of the defendant company, while engaged in work upon them as stated in the petition. The evidence further disclosed the fact that it was the duty of the engineer at the power house to turn on the electric current, and that a rule of the company required him, five minutes before turning it on, to give three blasts of a whistle, one short and two long blasts, as a signal or warning to the linemen that the current would be turned on; that the whistle was a peculiar one, unlike any other in the city, and that it could be heard throughout the entire city and even beyond its limits; that the engineer had been in the service of the company, as engineer, for seven years; that it was customary, at the time of year when the accident happened, to turn on the current, for the purpose of lighting the city, about six o'clock, p. m., but that on the occasion of this accident it was turned on between three and four o'clock in the afternoon; that the current was sometimes turned on at other times during the day, for various purposes; that after the whistle had blown the linemen either quit work on the wires or handled them as live wires. Green, one of the plaintiff's witnesses, testified as follows: "I know why the current was turned on the day Wells was killed. There was a loop that was in trouble the night before, and they could not light the southern part of the city. The next morning Mr. Keck, the superintendent of the electric light and power company, sent me out to look for the trouble, and I found it at Duffy and Price streets, where there was a box burnt out. I told Mr. Keck, and he told me to go back over the balance of it and see that it was perfectly clear, and they would try it before night. I went back and put this box in, and reported it to Mr. Keck about one o'clock, and he sent me to put up a transformer at the corner of South Broad and West Broad streets, and I went and put that up and connected the wires. The current was turned on to test that loop, to try that loop and see if it was right before night. It was not turned on to light the city. The test was made in the afternoon between three and four o'clock. The current is never turned on, on fair days, until about an hour before sunset," and "the day that Wells was

killed was a fair day." The evidence in behalf of the plaintiff tended to show that the whistle was not blown before the current that killed Wells was turned on; while that for the defendant conduced to show that the whistle was blown on that occasion, as the rule of the company required. There was evidence of the value of the life of the decedent. The jury returned a verdict for the plaintiff, and upon defendant's motion for a new trial being overruled it excepted.

Counsel for the defendant in error contended that the testimony of the witness Green, which is quoted above, showed that the current that killed Marlow Wells was turned on by Keck, the superintendent of the defendant company. It is obvious, however, that no such inference can be fairly drawn from Green's testimony. It merely showed that Keck, the superintendent, said that a test was to be made before night, but there was nothing from which it could be legitimately inferred that such test would not be made by the engineer turning on the current, as it was his duty to do, and under the usual rule. The engineer testified positively that he turned on the current which killed Wells, and there was no evidence to the contrary. We shall, therefore, consider the case from the standpoint that the engineer turned on the current. There is grave doubt as to whether or not the evidence was sufficient to authorize the jury to find that the engineer did not blow the whistle before he turned on the current from which Wells received the shock which resulted in his death. But granting that the engineer neglected to give the required signal upon that occasion, and that his failure to do so caused Wells's death, was the defendant, under the law, liable for his homicide? In other words, would the rule as to fellow-servants, as stated in section 2610 of the Civil Code, apply? viz., that the master, except in case of railroad companies, is not liable to one servant for injuries arising from the negligence or misconduct of other servants about the same business. Counsel for defendant in error contended that the facts of this case did not bring it within such rule, for the reason that the respective duties of the engineer and the lineman, Wells, were performed in different departments of the company's business, so that there was no opportunity for the exer-

tion of a mutual influence upon each other's carefulness; and the case of *Cooper* v. *Mullins*, 30 *Ga.* 146, was relied on to support such contention.   It will clearly appear from an examination of that case that what the learned judge who delivered the opinion of the court said upon the subject of the foundation of the above-stated rule was merely obiter, as the question of fellow-servants was not involved in the case; for in the latter part of the opinion he said:   "But it is not even true that the two employees in this case were servants of the same master.   . One of the engineers was in the pay of the Western and Atlantic Railroad, and the other, Mullins, who was injured, was in the pay of the Georgia Railroad, and at the very time when he was hurt was doing a job for which the Georgia Railroad, and not himself, was to receive pay from the other road.   The Georgia Road furnished to the other an engine and engineer, that is to say a team and driver, for a single occasion.   Whose servant was that driver?   In the case of *Laugher* v. Pointer, 5 Barn. & Cress. 547, a stable-keeper had hired a team and driver to another person for a day, and the question was, whose servant was the driver?   The Court of King's Bench were equally divided, but Judge Story, in a note to sec. 4536 of his work on Agency, says that all the subsequent cases have followed the opinion of those who held that the driver was the servant of him who had furnished him, and in whose pay he was, and not of him who had him but for a single occasion, who had no part in selecting him, and who was under no obligation to pay him. The parallel between that case and this seems to be complete. For these reasons a majority of the court think that the doctrine relating to servants of the same master is not applicable to this case, and that the charge asked on it might have been refused instead of being merely modified as it was by the judge." Indeed, in *Killian* v. *Railroad Co.*, 78 *Ga.* 749, the case of *Cooper* v. *Mullins* was cited as authority for the proposition that a person in the employment of a railroad company, who was directed to accompany a train and to deliver a load of lumber, etc., at a point on the line of another railroad, and who was killed by the cars leaving the track of the latter road, by reason of an alleged defect in the construction of the track, was not an

employee of the latter road for the purpose of transacting the business in which he was engaged.

Counsel for defendant in error also cited *Atlanta Cotton Factory Co.* v. *Speer*, 69 *Ga.* 137, *Bain* v. *Athens Foundry*, 75 *Ga.* 718, *Krogg* v. *Railroad Co.* 77 *Ga.* 202, and Hough v. Railroad Co., 100 U. S. 214. The ruling in *Speer's* case was merely to the effect that the employer is not relieved from liability when the employee, whose negligence causes the injury, occupies the position of quasi-master as to his injured coemployee. In *Bain's* case it was held, two Justices presiding, that "Although persons were employed by the same master, yet where one of them was employed as a blaster for the purpose of removing certain rocks on the master's property, and alone had charge of the work of blasting, and the other had nothing to do with it, but was employed as a woodworkman in the foundry of the master, they were not fellow-servants in the legal sense of the term." In *Krogg's* case it appeared that Gabbett was the general manager and the highest officer of the defendant railroad companies in Alabama; "that he had charge of the running of the roads, the control of the employees, and the care of the track." Mr. Justice Blandford, in delivering the opinion of the court, cited 42 Ala. 672, 61 Id. 554, 67 Id. 18, and said: "In these cases that court seems to rule that Gabbett is not a fellow-servant with Krogg, the engineer, and we think that view is correct. . . And this was the ruling of the Supreme Court of the United States in Hough v. Texas Pacific Railroad, 100 U. S. Rep. 214. The decisions of this court [Supreme Court of Georgia] have been uniform that a fellow-servant is one employed about the same work with the servant injured, and whose negligence caused the injury to the servant complaining. See 30 *Ga.* 146, 150, in which Judge Stephens takes a philosophical view of this question, and ruled as this court did in *Bain* v. *Athens Foundry,* decided two terms ago, 75 *Ga.* 718 ; but the case cited in 100 U. S. is a learned and able opinion, and is absolutely decisive of this question. If any doubt formerly existed as to who were fellow-servants, that decision resolves the doubt." While it was announced in *Krogg's* case that a fellow-servant is one employed about the same work with

the servant injured, and it was accordingly held that the general manager of a railroad company was not a fellow-servant of the locomotive engineer of the company, who was injured by reason of the engine he was driving being thrown from the track, we do not think it can fairly be said that the court intended to lay down the proposition that in order for employees of a common master to be fellow-servants they must be engaged in precisely the same work. As we have seen, the cases of *Cooper v. Mullins* and *Bain* v. *Athens Foundry* had not committed this court to any such doctrine when *Krogg's* case was decided. At the time that case was decided section 2202 of the Code of 1882, now section 2610 of the Civil Code, above quoted, was in force. The words used in that section are, "servants about the same business," and "business," as there used, signifies the employment or occupation in which a person is engaged to procure a living. The words "same work" as used in *Krogg's* case must be understood as being synonymous with "same business" in the section of the code referred to. Hough's case is not authority for the contention of the defendant in error. The ruling there made simply recognized the principle that it is one of the master's positive duties to provide his servants with reasonably safe machinery and appliances, and that employees to whom this duty is delegated are, with respect to its performance, vice-principals of the master, who will be liable for their negligence in failing to properly discharge such duty.

In *Ellington* v. *Beaver Dam Lumber Co.,* 93 *Ga.* 53, where it was held that a fireman on a locomotive and a track-hand on a tramroad were fellow-servants, Mr. Justice Lumpkin, in discussing the cases of *Cooper* v. *Mullins, Bain* v. *Athens Foundry.* and *Krogg* v. *Railroad Co.,* said that nothing contained in those cases conflicted with the rule he announced for determining who are fellow-servants, viz., that the test of fellow-service is whether or not employees are alike subject to direction and control by the same general master in the same common undertaking, citing Wood's M. & S. §435; which rule was but recently followed in *Ingram* v. *Hilton & Dodge Lumber Co.,* 108 *Ga.* 194, and *Hamby* v. *Union Paper-Mills Co.,* ante, p. 1. This same test was adopted in *Prather* v. *Railroad Co.,* 80

*Ga.* 427, where Mr. Justice Simmons, now Chief Justice, quoting Wood's Railway Law, § 388, said: "The true test of fellow-service is community in that which is the test of service, — which is, subjection to control and direction by the same common master in the same common pursuit. . . 'In order to constitute fellow-laborers, . . it is not necessary that the servant causing and the servant sustaining the injury shall both be engaged in precisely the same, or even in similar acts.'" In *Keith* v. *Walker Iron & Coal Co.,* 81 *Ga.* 49, it was held that two colaborers, one a carpenter and the other a brick-mason, were fellow-servants, because, though laboring in different departments and entirely dissociated in the actual conduct of their work, "they were coemployees of a common master, and co-operating in their respective departments of labor to a common end, to wit, the erection and completion of the contemplated structure." In *White* v. *Kennon & Co.,* 83 *Ga.* 343, it was held that a track repairer, who was injured by the negligence of the engineer on whose train he was riding, was a fellow-servant of the engineer, and could not recover against their common master, such master not being a railroad corporation; and in *Davis* v. *Muscogee Manufacturing Co.,* 106 *Ga.* 126, an engineer in a factory and a laborer engaged in washing the windows on the outside thereof were held to be fellow-servants. As early as *Shields* v. *Yonge,* 15 *Ga.* 349, the doctrine of assumed risks was recognized by this court, it being there held that "A servant, when he engages to serve a master, undertakes, as between him and his master, to run all the ordinary risks of the service; and this includes the risk of negligence, on the part of a fellow-servant, whenever he is acting in discharge of his duty, as servant of him who is the common master of both." See also Civil Code, § 2612. This is the reason almost universally recognized as the foundation of the fellow-servant rule. 12 Am. & Eng. Enc. L. (2d ed.) 902.

The "different-department limitation," or the "doctrine of consociation," to the effect that the fellow-servant rule is not applicable where the servant injured is employed in a department of the general service which is separate and distinct from that of the servant whose negligence caused the injury, is not recog-

nized in this State, as is manifest from the decisions referred to above; and the great preponderance of judicial authority elsewhere is unquestionably against such a restriction of the fellow-servant rule.   12 Am. & Eng. Enc. L. (2d ed.) 971 et seq. The "different-department limitation" was strongly urged by counsel for the plaintiff in the case of Farwell *v.* Boston & W. R. Corp., 4 Met. 49, 38 Am. Dec. 339, which is considered the "mother case" on the fellow-servant rule, but the court refused to recognize it.   In the course of his very interesting, lucid, and able opinion, Chief Justice Shaw, after discussing the principles of law and reason applicable to the case, said:   "In applying these principles to the present case, it appears that the plaintiff was employed by the defendants as an engineer, at the rate of wages usually paid in that employment, being a higher rate than the plaintiff had before received as a machinist.   It was a voluntary undertaking on his part, with a full knowledge of the risks incident to the employment, and the loss was sustained by means of an ordinary casualty, caused by the negligence of another servant of the company.   Under these circumstances, the loss must be deemed to be the result of a pure accident, like those to which all men, in all employments, and at all times, are more or less exposed; and, like similar losses from accidental causes, it must rest where it first fell, unless the plaintiff has a remedy against the person actually in default, of which we give no opinion.   It was strongly pressed in the argument that, although this might be so, where two or more servants are employed in the same department of duty, where each can exert some influence over the conduct of the other, and thus to some extent provide for his own security, yet that it could not apply where two or more are employed in different departments of duty, at a distance from each other, and where one can in no degree control or influence the conduct of another.   But we think this is founded upon a supposed distinction, on which it would be extremely difficult to establish a practical rule. When the object to be accomplished is one and the same, when the employers are the same, and the several persons employed derive their authority and their compensation from the same source, it would be extremely difficult to distinguish what con-

stitutes one department and what a distinct department of duty. It would vary with the circumstances of every case. If it were made to depend upon the nearness or distance of the persons from each other, the question would immediately arise, How near or how distant must they be to be in the same or different departments? In a blacksmith's shop persons working in the same building, at different fires, may be quite independent of each other, though only a few feet distant. In a rope-walk, several may be at work on the same piece of cordage, at the same time, at many hundred feet distant from each other, and beyond the reach of sight and voice, and yet acting together.

"Besides, it appears to us that the argument rests upon an assumed principle of responsibility which does not exist. The master, in the case supposed, is not exempt from liability because the servant has better means of providing for his safety, when he is employed in immediate connection with those from whose negligence he might suffer, but because the implied contract of the master does not extend to indemnify the servant against the negligence of any one but himself; and he is not liable in tort, as for the negligence of his servant, because the person suffering does not stand toward him in the relation of a stranger, but is one whose rights are regulated by contract, express or implied. The exemption of the master, therefore, from liability for the negligence of a fellow-servant, does not depend exclusively upon the consideration that the servant has better means to provide for his own safety, but upon other grounds. Hence the separation of the employment into different departments can not create that liability, when it does not arise from express or implied contract, or from a responsibility created by law to third persons and strangers, for the negligence of a servant. . . The responsibility which one is under for the negligence of his servant, in the conduct of his business, toward third persons, is founded on another and distinct principle from that of implied contract, and stands on its own reasons of policy. The same reasons of policy, we think, limit this responsibility to the case of strangers, for whose security alone it is established. Like considerations of policy and general expediency forbid the extension of the principle so far as to warrant a serv-

ant in maintaining an action against his employer for an indemnity which we think was not contemplated in the nature and terms of the employment, and which, if established, would not conduce to the general good." As said by Judge Dillon in a learned article, entitled, "American Law Concerning Employer's Liability," 24 American Law Review, 189, "The words 'fellow-servant' and 'common employment' are misleading, if they are understood to be limited to cases where the servant injured and the servant causing the injury are working side by side in the same precise work." Citing Farwell's case and Wilson v. Merry, L. R. 1 H. L. Cas. Scotch App. 331, 332. See Brodeur v. Valley Falls Co., 16 R. I. 448; Quebec S. S. Co. v. Merchant, 133 U. S. 378; Northern Pac. R. Co. v. Hambley, 154 U. S. 349; New England Ry. Co. v. Conroy, 20 Supreme Court Rep. 85.

Applying the law as we conceive it to be to the facts of the present case, the engineer of the Brush Electric Light and Power Company and Wells, its lineman, being subject to direction and control by the same general master, in the same common enterprise, were fellow-servants, though employed in different departments of duty and so far removed from each other that one could in no degree control or influence the conduct of the other; and, granting that Wells was killed by reason of the negligence of the engineer, in failing to give the signal before the electric current was turned on, the defendant company was not liable to Wells's widow for his homicide. The verdict being contrary to the law as herein announced, the trial judge erred in refusing to grant a new trial.

*Judgment reversed. All the Justices concurring.*